ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-29-09

UNITED STATES OF AMERICA

-against-

SAMUEL A. FISHMAN,

                              Defendant.

08 Cr. 221 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, UNITED STATES DISTRICT JUDGE.**

On March 28, 2008, Defendant Samuel Fishman ("Fishman") pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341. Prior to sentencing, Fishman moved:

(1) that the Court grant his request for a downward departure on the grounds that (a) he engaged in charitable and civic activities that were extraordinary in nature, and (b) any sentence of incarceration would result in the inevitable closing of the Sinai Schools, where he worked as a fundraiser and financial advisor since 2006; and

(2) that, in weighing the factors listed in 18 U.S.C. 3553(a), the Court favorably consider, among other things, his history of charitable acts, the punishments he had already suffered, and the availability of alternate sentencing options.

At Fishman's sentencing before the Court on June 26, 2009, as further elaborated upon in the Statement of the Court which is attached hereto and incorporated herein, the Court

denied Fishman's motion for a downward departure.  However, the Court considered Fishman's extensive history of charitable and civic activities, and the possible impact that a sentence of incarceration would have upon the Sinai Schools, in its consideration of the factors under 18 U.S.C. § 3553(a)(1).

The Court concluded that, under the United States Sentencing Guidelines, Fishman's total adjusted offense level for the seven Counts on which he was found guilty is thirty-one (18) and his criminal history category is I.  The Court sentenced Fishman to serve a term of incarceration of fifteen (15) months and pay a fine of $10,000.00, upon consideration of the factors listed in 18 U.S.C. § 3553(a), to be followed by three (3) years of supervised release.

**SO ORDERED.**

Dated:     New York, New York
           29 June 2009

                                        Victor Marrero
                                        U.S.D.J.

## UNITED STATES OF AMERICA V. SAMUEL FISHMAN
### 08 CR. 221

**STATEMENT BY THE COURT REGARDING DEFENDANT'S SENTENCE**

**JUNE 26, 2009**

**VICTOR MARRERO, UNITED STATES DISTRICT JUDGE.**

In seeking the Court's leniency, Fishman has made an impassioned case here and in his extensive written submissions that raise several significant issues.   The professional thoroughness and diligence evident in counsel's preparation, the strength of advocacy and the level of support expressed for Fishman by friends, family and business associates, call for a correspondingly detailed explanation of the Court's ruling.

As a point of departure, the Court notes that Fishman's presentation, though stressing points that argue for uniqueness, distinction and individual consideration, in fact is not uncommon.   The Court has heard much of the argument in echoes from similar pleas for mercy frequently urged in this courthouse, indeed in courtrooms across the country.   In particular, Fishman's argument falls into a pattern advanced by a subset of the white collar criminal.   This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as Fishman.   The list of their achievements and virtues is long and impressive.   At home,

-1-

they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors. And as worshipers they are devout, often rising as leaders of the congregation.

Yet, for all of their outward rectitude, these otherwise good people suffer a fatal flaw: they sometimes lead a double life. Somewhere at the core, in a distorted dimension of the soul, the public image they present is as false as the lies they tell to sustain the appearances of an exemplary life. And somehow, for reasons that always defy reason, they fall into crime, doing wrongful deeds that seem aberrational, selfish and greedy acts that, when caught, they claim are entirely out of character with their otherwise law-abiding lives.

Typically, these offenders appear at their sentencing well-represented and well-prepared, offering ample reasons why the Court should exercise exceptional discretion and show maximum leniency. A key aspect of the evidence proffered in mitigation consists of medical records and psychological evaluations attesting that the defendant's criminal conduct, so at odds with an upright character, was driven by some recently diagnosed mental disorder, or ungovernable impulse,

-2-

other unknown inner or outer demon he could not conquer that made him do it. An outpouring of sympathy and support from relatives, friends, business colleagues, community leaders, and even some of the victims, accompanies the presentation. The beneficiaries of the defendant's charitable work, in some cases intensified since his arrest, testify about his devotion of good will and donation of resources, and underscore the loss they and the larger community would suffer if deprived of the defendant's invaluable contributions to their public services. And of course, the defendant rises in the courtroom to convey profound, personal apologies for all the sorrow he has caused to all the people with whom he broke faith and hurt and betrayed and shamed.

As it ends, the presentation comes to several conclusions it urges the Court to adopt: that the defendant has already shown full rehabilitation and earned redemption; that there is absolutely no likelihood of recidivism from this defendant and thus no threat of future harm to society; that no further need exists to punish the defendant because he has been wracked long enough by shame, by ruin of his family and personal life, by loss of his primary means to earn a livelihood. The purposes of sentencing thus having been satisfied, ergo: a sentence of any incarceration would serve little or no useful purpose; probation would suffice.

-3-

Let me stress at this point that the Court is not unmindful or unsympathetic to these points. There is much in Fishman's plea to commend the compassion it seeks to evoke. But the argument goes only so far. Compelling as it sounds on the surface, it fails in some essential ways. Fundamentally, it is flawed by what it omits. In particular, it makes no account of several other circumstances courts are instructed to weigh adequately in ordering a fitting sentence: to reflect the severity of the crime; to promote general respect for the law; to avoid unwarranted sentencing disparities; and to consider the impact of the crime not only on its immediate victims, but on the larger social order. These principles are interrelated. They share vital links with some basic legal and philosophical concepts, ideals emblematic of the law profoundly significant for sentencing to ensure a right and just result for all concerned: fairness, balance, proportionality, and equality of treatment under law for relatively similar persons and circumstances. In sentencing, these principles seek to ensure that judgments overall fairly align so as to achieve, like planets in orbit, a special form of equilibrium, a proper balance in the delicate symmetry of justice.

In addressing the specific weaknesses in Fishman's entreaties, I consider more fully several other particular

-4-

points.  First, with regard to the severity of the crime, the common white collar appeal for leniency tends to understate the gravity of the underlying offenses by compressing the defendant's entire record of misconduct as if it were a single, isolated episode of crime, a one-time or sometime thing that occurred over a lifetime of otherwise immaculate behavior.  There is a fallacy in this argument.  It distorts the record, as illustrated by the case at hand.  During the course of over thirteen years covered by the offense for which he pleaded guilty in this case, Fishman committed dozens if not hundreds of acts of dishonesty and fraud. He alone devised the false billing scheme and defrauded numerous clients, his law partners, and firm.  From each of these victims, some of them close clients and friends, on multiple, separate occasions over this thirteen-year period, he essentially stole large sums of money.  In fact and under law, each of these thefts constitutes a distinct crime for which an offender could be prosecuted by federal or state authorities.  So it is misleading, a gross understatement, to suggest that Fishman all along pursued a straight path within a law-abiding life -- except for those inconvenient detours, his deviations hundreds of times in the incidents of thefts and attendant falsehoods he concealed over at least thirteen years.

-5-

The gravity of Fishman's crime has another dimension.   In one special respect particularly resonant in this forum, Fishman is not just another citizen or an ordinary offender. He is an officer of the Court.   He once took an oath in a courtroom such as this essentially affirming not only that he would serve a vital role in facilitating the Court's application of the law, but that he would himself uphold the law himself, and the canons of ethics governing his professional practice.   By virtue of that oath, and the grace and privilege conferred upon him by the public through his license to practice law, he rose to substantial wealth and prominence in his various legal and social communities -- a public privilege and function he has betrayed by extensive criminal conduct.

Second, casting Fishman as the upright citizen who once went astray overlooks or improperly minimizes perhaps the darkest aspect of his deeds.   It is precisely the defendant's mantle of integrity and benevolence that serves as cover for an invidious end, enabling him to move about his game undetected, the better to prey upon those who least expect it. In other words, it is the widespread recognition in the community that the defendant enjoys for strong character, integrity, sound values and good public deeds that facilitates his hidden life of crime.   The two aspects go hand in hand.

-6-

The offender's clean outward appearance inspires the
confidence of his victims, while also rendering those closest
to him -- trusting clients, partners, business associates --
his best bets.  That the defendant in these cases occupies the
same tight circles and mingles freely with his unsuspecting
victims, that by virtue of his standing as a man of honor his
crimes go undetected longer and he achieves more spectacular
success, and that he channels profits from his criminal
enterprise, at least in part, to support his charity and
further enhance his public image, all make his conduct that
much more sinister and reprehensible.

    Recognizing that at any given time the impulses for human
conduct are seldom all black or all white, I do not suggest
that in all respects the record of benevolence defendants
generally point to at sentencing springs entirely from cynical
motives.  By the same token, stark reality counsels against
naivete, and trains the eye to see illusion and call it for
what it is.  This unclouded view suggests to me that cases
arise in which a defendant commits serious crimes and then
begs for leniency under circumstances such as those presented
here, and thus uses his good name and good works -- again at
least to some degree -- as both sword and shield, the mask of
piety he wears is but the face that previously disarmed his
victims, and his front of charity merely the human shield he

-7-

raises to seek immunity or dramatic mitigation of punishment when he is caught.

In addition, just as the leniency argument tends to falsely portray the offender's crimes as isolated in relation to his life, it also views the underlying misconduct in isolation relative to another point of reference that the Court cannot disregard: the significant number of other offenders similarly situated, those convicted of similar crimes but who were sentenced to a warranted term of imprisonment. To overlook how this Court and others have sentenced wrongdoers guilty of the same offenses under sufficiently comparable factual circumstances, is to ignore another vital dimension of justice's symmetry: the principle that sentencing should avoid unwarranted disparities. In this regard, the Court considers the general principle that the sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses. Relevant to this point is that white collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social

-8-

and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.

In more concrete application of the principles regarding unwarranted disparities, whenever pressed by intense arguments such that Fishman makes today, the Court regards that sentencing compass point for relevant guidance. It asks itself: what if any of the offenders the Court previously sentenced to prison terms for similar crimes under comparable circumstances were in the audience today and listening to this proceeding? If the Court were to grant Fishman his liberty through a sentence of probation or other term amounting to the proverbial rap on the knuckles, how would it fairly and persuasively justify the judgment, both to others and to itself, when, for reasons that apply with equal force here, it has repeatedly rejected similar sentencing appeals from other offenders whose criminal and personal circumstances were similar, or if different, only marginally so? For instance, sitting out there in the public benches right now, if not physically, at least in spirit, the Court senses the presence, weighing upon its judgment like atmospheric pressure, of several other defendants, all otherwise outstanding citizens who also engaged in considerable good works, but who were

-9-

sentenced here to substantial terms of incarceration for stealing hundreds of thousands of dollars. Just to recall a few I can name, one of them stole from a church, another stole from an agency of the City of New York, a third one looted a hospital.

Fishman's argument also omits due recognition to the impact of his crimes on all of his victims. Now, the Court recognizes that some of the people who have written to the Court on Fishman's behalf were victims of his wrongs. But the Court must also consider that these friends in Court do not comprise all of the victims, nor are they necessarily typical to the extent some of them have atypical reasons for their support, such as the ability to be forgiving because they can afford to absorb the loss or have already been made whole. No less important a consideration is that the victims of crime are not necessarily just the people who suffer direct losses by reason of an offense. There is a dimension of crime that diminishes the rule of law and the social order as a whole, and that if not properly recognized for what it is when the perpetrator is convicted, disregards the interest of society in effective law enforcement and effective administration of justice.

Finally, the Court notes that preservation of the rule of law and protection of the social order depend integrally upon

-10-

proper respect for the law. To the degree a sentence either entirely disregards or does not adequately weigh the aspects of sentencing that Fishman's presentation omits, and that the Court here considers, the judgment will not sufficiently align with our collective vision and wisdom of what a right and just sentencing result should reflect, both generally and in this case. Any sentence substantially out of line with that universal view would unduly tip the scale, and not engender proper respect for the law, thus potentially undermining the integrity of the justice system.

The Court next addresses some specific issues that Fishman's sentencing raises. Specifically, Fishman seeks a downward departure, premised upon his charitable and civic activities, particularly his work at the Sinai schools. Under Sentencing Guideline § 5H1.11, "military, civic, charitable, or public service, employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." However, the Second Circuit has recognized that the Court is authorized to grant a downward departure if such good works are "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005) (quoting Koon v. United States, 518 U.S. 81, 96 (1996)). In

-11-

Case 1:08-cr-00221-VM   Document 13   Filed 06/29/09   Page 14 of 19

this case, the Court is persuaded that Fishman's charitable
and civic activities, while extremely laudable, do not warrant
a downward departure in his offense level.  Rather, the Court
will fully consider and weigh Fishman's charitable activities
in connection with its analysis of the § 3553(A) factors.

The Court therefore adopts the factual recitation in the
presentence investigation report.  Thus, the Court finds that
under the Guidelines, Fishman's offense level amounts to
eighteen (18) and his criminal history falls into category one
(I).  The recommended range of imprisonment for this offense
level and criminal history category is twenty-seven (27) to
thirty-three (33) months.

Fishman pled guilty to one count of mail fraud in
violation of 18 U.S.C. § 1341.  In his capacity as a partner
at the law firm of Latham & Watkins, Fishman was responsible
for, among other things, supervising and approving client
invoices.  From about 1993 to 2005, Fishman charged the firm
and its clients hundreds of thousands of dollars for personal
and non-existent business expenses.  He also inflated the
actual costs incurred by the firm to clients, and caused the
firm to pay his personal expenses, such as hotel bills, by
mischaracterizing them as reimbursable business expenses.
Fishman ultimately defrauded Latham & Watkins or its clients
of about $350,000.

-12-

Subsection (A)(1) of 18 U.S.C. 3553 requires that courts take into consideration "the nature and circumstances of the offense and the history and characteristics of the defendant." As I detailed earlier, Fishman conducted his fraud over the course of thirteen years. His victims were his employer, Latham & Watkins, and his clients, all of whom placed their trust in him. Fishman's abuse of that trust is what enabled him to perpetuate his fraudulent scheme.

The Government suggests that Fishman's request for a below-guidelines sentence under § 3553(A)(1) is based, in part, on his professed bipolar disorder. However, Fishman's submission of June 24, 2009 establishes that he makes no claim of a causal relationship between his professed illness and his crime, nor does he seek a downward departure on psychological grounds. Having reviewed Fishman's submissions, the Court concludes that Fishman's bipolar disorder, to the extent that it may exist, will have no effect on the Court's ultimate sentence. Thus, the Court will not consider the Government's submission of Dr. Stuart Kleinman's psychiatric report.

In assessing the history and characteristics of the defendant, the Court takes note of Fishman's charitable activities, most particularly those in association with the Sinai schools, where he was a volunteer and board member. Fishman's association with the Sinai schools began in 1984,

-13-

when his son attended the schools, and continued through 2003. Fishman returned to the Sinai schools in 2006 as a volunteer, and he has been employed by the schools since 2007, primarily in a fundraising and advisory capacity, currently earning a salary of $180,000 a year.

Several representatives from the Sinai schools have submitted letters to the Court attesting that if Fishman is incarcerated, the Sinai schools will cease operations, causing its demise and resulting in incalculable hardship to needy children and their families. While the Court holds great sympathy for such innocent victims, it cannot innoculate Fishman from his fraudulent conduct, which too created its own other victims.

Fishman directs the Court to United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995), where the Second Circuit held that a downward departure was warranted based on the defendant's indispensability to his business and employees. In that case, however, the defendant's original sentencing range was for eight to fourteen months, and imprisonment was required for only half the term. Here, Fishman faces a range of twenty-seven to thirty-three months. Further, in Milikowsky the district court reduced the offense level by 1, from 11 to 10. That one-level reduction placed the defendant in Zone B, which authorized the Court to impose a sentence of probation and

-14-

home confinement. An equivalent reduction in Fishman's case would not be from **11** to 10, but from **18** to 10. Even assessing Fishman's good work under § 3553(A) instead of as a downward departure, the Court's consideration of the potential impact of Fishman's incarceration upon third parties can only go so far. Similarly, in <u>United States v. Tomko</u>, 562 F.3d 558 (3d Cir. 2009), where the defendant received a sentence of probation after pleading guilty to one count of tax evazion, the Sentencing Guidelines recommended a range of 12 to 18 months, as compared to the 27 to 33 month facing Fishman.

<u>Milikowsky</u> is relevant to another of Fishman's arguments. Fishman and representatives from the Sinai schools strenuously attest to Fishman's indispensibility to the survival of the Sinai schools. According to these submissions, Sinai's board and staff have no confidence that they could find anyone to replace Fishman. In <u>Milikowsky</u>, the defendant was the "only individual with the knowledge, skill, experience, and relationships" to run his steel trading concerns on a day-to-day basis. The defendant was "the sole buyer of all steel," and his "steel-buying expertise" was the only reason the defendant's businesses had remained viable.    65 F.3d at 8. Because of that specialized skill, the companies' continued livelihood depended entirely on the defendant's personal

-15-

involvement, and his incarceration would have resulted in the inevitable  unemployment of 150-200 employees.

Fishman's role at the Sinai schools, however, is decidedly different.  The Sinai schools contain a Board of leaders, and had been in existence for many years before Fishman became a salaried employee in 2007.  Indeed, Fishman's submission indicates that his role at the Sinai school is not day-to-day indispensibility, but rather long-term financial planning.  Further, fundraising for a private school is not the sort of specialized position as that of the steel-buyer of a sole-proprietorship.   Particularly given the current economic climate, the Court is skeptical that there would exist in New York, or in this region, no other individual who could work in a fundraising or financial capacity at a salary of $180,000 a year.  Finally, the Sinai schools were aware of Fishman's legal situation when he became a salaried employee in 2007, and have had more than ample time to prepare for a possible transition in fundraising leadership.  Taken as a whole, while the Court is sympathetic to the Sinai schools' position, the Court is not persuaded that Fishman's role is comparable to that of the defendant's in Milikowsky -- and again, that defendant received only a one-level reduction in his offense level.

-16-

Subsection (A)(2) of 18 U.S.C § 3553 requires that the Court consider the need for the sentence to promote certain objectives of the criminal justice system, namely: punishment, specific and general deterrence, and rehabilitation.

Pursuant to § 3553(A)(6), the Court is also directed to consider the need to avoid sentence disparities among defendants with similar records and similar offenses in other cases, as well as in connection with the case at hand. See, e.g., Milikowsky, Tomko.

Accordingly, weighing all of the considerations set forth in 18 U.S.C. § 3553(a), the Court concludes that a sentence of fifteen (15) months of incarceration, followed by three years of supervised release, and a fine of $10,000.00, is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.