

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-30-09
```

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 22, 2009

BY FACSIMILE AND HAND DELIVERY

Honorable Victor Marrero
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007



RECEIVED JUN 2 3 2009 CHAMBERS OF JUDGE MARRERO

**Re: United States v. Samuel A. Fishman, 08 Cr. 221 (VM)**

Dear Judge Marrero:

Sentencing in the above-referenced matter is scheduled for June 26, 2009. The Government respectfully submits this letter in response to the sentencing submmissions of defendant Samuel A. Fishman ("Fishman" or the "defendant"). After much consideration, the Government agrees with the United States Probation Office that a sentence within the Stipulated Guidelines Range of 27 to 33 months is appropriate in this case.

## I. Background

On March 14, 2008, the defendant was charged in an Information with one count of mail fraud, in violation of Title 18, United States Code, Section 1341, in connection with a scheme to defraud clients of the law firm of Latham & Watkins ("Latham") by presenting them with false and fraudulent expense reports, from in or about 1993 to 2005. During those years, Fishman was a partner at Latham.

On March 28, 2008, the defendant entered a guilty plea before this Court pursuant to a plea agreement with the Government. In the plea agreement, the parties agreed that the Stipulated Guidelines Range would be 27 to 33 months. However, the defendant reserved the

Honorable Victor Marrero                                                                      Page 2
June 22, 2009

right to move for downward departures based on his alleged diminished capacity and his charitable works. The Government reserved the right to oppose such motions.

## II.   A Downward Departure Based On Diminished Capacity Is Not Warranted

As indicated in a footnote in the defendant's "Factual Pre-Sentencing Memorandum," Fishman is not seeking such a departure "for a variety of legal, personal and psychological reasons." Def. Fact. Mem., at 13 n.1. However, we address this issue here because many letters in support of Fishman have mentioned his claimed bipolar disorder and his mental health treatment, including a letter from Dr. Robert Glick, who began treating Fishman beginning in or about June 2005, the same time Latham was conducting its internal investigation, and another letter from S. David Shapiro, President of the SINAI Schools, in which he referred to a "causal connection between Sam's wrongful behavior and his serious mental illness." (Def. Exh. E, at 4).

The Government opposes such a departure. As the Court is aware, the Government requested several adjournments of sentencing, with the defendant's consent, in order to conduct an independent psychiatric examination of the defendant. In connection with that evaluation, Dr. Stuart Kleinman, the Government's expert, interviewed several individuals who had known and/or worked with Fishman, and reviewed various documents relating to the offense conduct and certain medical/psychological records. However, Dr. Kleinman was not able to review Dr. Glick's reports because Dr. Glick did not provide the Government with his treatment record for the defendant, despite our sending him a signed release from the defendant. In or about February 2009, Dr. Kleinman attempted to schedule an interview with the defendant. At that time, defense counsel informed me that Fishman no longer wished to argue for a downward departure on the basis of diminished capacity and did not wish to be interviewed by the Government's expert. Based on the defense's representations, we discontinued the psychiatric evaluation of Fishman. Because the Government has not had an opportunity to fully assess the extent of Fishman's mental condition or the validity of Dr. Glick's evaluation, and because Fishman is not seeking a departure based on diminished capacity, we request that the Court not consider Fishman's claimed bipolar disorder in imposing sentence.

Should the Court decide to consider Fishman's mental condition for sentencing purposes, the Government further requests that sentencing be adjourned to allow Dr. Kleinman time to complete his evaluation so that the Court may have a full picture of Fishman mental health condition and its relationship, if any, to his crime.

### III. A Downward Departure Based On Good Works Is Not Warranted

The defendant moves for a downward departure based on his charitable work with SINAI. For the reasons discussed below, the Government opposes this motion.

#### A. Applicable Law

The Sentencing Guidelines make clear that "civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11; *accord United States* v. *Canova*, 412 F.3d 331, 358 (2d Cir. 2005); *see United States* v. *Cooper*, 394 F.3d 172, 176 (3d Cir. 2005) ("The sentencing guidelines discourage departures for good works."). This factor may be considered only if it "'is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.'" *Canova*, 412 F.3d at 358 (quoting *Koon* v. *United States*, 518 U.S. 81, 96 (1966); *Cooper*, 394 F.3d 176 ("Only when those [good] works are 'exceptional' do the guidelines permit them to serve as a basis for departure.").

The Third Circuit, in a case that relies on decisions from several circuits, has provided the following guidance for determining whether a defendant's good works rise to the level of the exceptional:

> Whether good works qualify as exceptional is evaluated with reference to the offender's wealth and status in life. [*United States* v. *Thurston*, 358 F.3d 51, 80 (1st Cir. 2004)]. More is expected of "high-level business executives" who enjoy "sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." *United States* v. *Haversat*, 22 F.3d 790, 796 (8th Cir. 1994). Indeed, "it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." *United States* v. *Kohlbach*, 38 F.3d 832, 838 (6th Cir. 1994). Moreover, we must be mindful that individuals "who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot." *Thurston*, 358 F.3d at 80. The relevant inquiry, therefore, is not whether [the defendant] performed charitable works, but whether those works . . . "were exceptional enough to overcome the judgment of the Sentencing Commission that a record of good works is a discouraged basis for departure." *Id.* at 79.

Honorable Victor Marrero                                                                                              Page 4
June 22, 2009

*Cooper*, 394 F.3d at 176-77. Furthermore, "being a 'good person,' a quality indeed to be admired, does not qualify as extraordinary or exceptional civic or charitable conduct." *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000).

### B. Discussion

Fishman predicates his motion for a good works downward departure on his volunteer and paid work with the SINAI Schools ("SINAI") for Jewish children with special needs. To evaluate whether his endeavor has been extraordinary or exceptional, so as to warrant a downward departure, it is useful to consider three different periods of Fishman's involvement with SINAI, as described below.

#### Period I: 1986 to 2003

Fishman's association with SINAI began in or about 1984, when his son was enrolled in SINAI at age six. (Def. Fact Mem., at 23). In 1986, he began volunteering in leadership positions with SINAI. (Def. Exh. E, at 2). Fishman's son remained in SINAI until approximately age thirteen (eighth grade) (Def. Fact. Mem., at 23), but Fishman continued to assist SINAI for about another twelve years, until in or about 2003. (Def. Exh. D, at 11; Def. Exh. E, at 2). It appears that over the years Fishman donated money to SINAI, served on its Board of Trustees and various leadership committees, and participated in meetings relating to those roles. However, it is not extraordinary for individuals to donate time and money to a cause that affects them or their family members, as in Fishman's case because of his son. That kind of personal motivation generally has not provided a basis for a downward departure based on good works. *Cf., e.g., Canova*, 412 F.3d at 358-59 (defendant volunteered in the Marine Corps as a college student and later served seven years as a volunteer firefighter, in the course of which he sustained injuries three times, delivered babies and administered cardo-pulmonary resuscitation); *Cooper*, 394 F.3d at 178 (defendant ran a youth football team in depressed neighborhood, mentored the youth, paid for four team members to attend a better high school, and helped one to go to college); *United States v. Tomko*, 562 F.3d 558, 572 (2d Cir. 2009) (pre-indictment activity helping the poor, including good works done anonymously); *Serafini*, 233 F.3d at 773-75 (defendant, among other good deeds, provided $300,000 guarantee to assist with treatment of a friend's son's brain tumor, hired another seriously disabled person, and established fund to defray cost of bone marrow transplant for a leukemia patient).

Nor is it uncommon for individuals in positions of wealth and influence to serve on charity boards. In fact, such board memberships are often sought, at least in part, because they confer status and good will upon the board member. In sum, the Government does not believe that the defendant's work with SINAI during this first period, although laudable, was so extraordinary as to take him outside the heartland of cases encompassed by the Guidelines.

Honorable Victor Marrero  
June 22, 2009

Page 5

### Period II: August 2006 to December 2006

In or about the summer of 2005, Latham reported Fishman's conduct to the Disciplinary Committee of the New York bar and the United States Attorney's Office. During roughly the same period, Fishman was asked to resign from Latham. Thus, Fishman had lost his job and faced the prospect of criminal prosecution. It was in this context that Fishman, at SINAI's request, began volunteering full-time with SINAI beginning in or about August 2006. While we do not minimize the valuable service that Fishman rendered to SINAI during this six-month period, we also believe that altruism was not necessarily his sole incentive. Indeed, he emphasized his work with SINAI as a basis for a request for deferred prosecution. Accordingly, we do not believe that his charitable endeavors during this middle period of six months were of a kind exceptional enough to overcome the Sentencing Commission's judgment that good works are a discouraged basis for departure.

### Period III: January 2007 to Present

By January 2007, Fishman was no longer working for SINAI as a volunteer. His work from January 2007 to the present cannot be characterized as "charitable" because he was well-compensated for his efforts. He received an annual salary of $240,000 a year. (PSR at 22). Even after taking a voluntary 25% pay cut in November 2008, he was still earning $180,000 a year (PSR ¶ 42), far more than many defendants who are prosecuted in this courthouse would ever earn in a year. Certainly, few people reap an annual salary of $180,000 to $240,000 for doing charitable work. In any event, doing one's job well is not the type of exceptional good deeds that would justify a downward departure. *See Serafini*, 233 F.3d at 773 ("Conceptually, if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants."). Moreover, in this period, as in Period II, in addition to his altruistic impulses, which we do not question, Fishman also had another incentive for working diligently on SINAI's behalf: it ensured the support of the SINAI community at his sentencing.

Fishman and his many supporters have emphasized that he is indispensable to SINAI's survival. The Government recognizes that many charitable institutions face financial hardship in the current economy. Yet we note that the defense made an analogous argument when the defendant was seeking deferred prosecution more than three years ago. At that time, the defendant and SINAI argued that it would be disastrous for SINAI if Fishman were charged with a felony. It has been fifteen months since the Information was filed, and no such disaster has occurred. SINAI's donors and other supporters have not deserted it. It is difficult to imagine that an institution that has existed since 1982 would suddenly collapse because of Fishman's temporary absence, especially given the ample time it has had to prepare for the consequences of Fishman's sentence, the good will that Fishman and other SINAI staff have generated among

Honorable Victor Marrero                                              Page 6
June 22, 2009

donors and community leaders for SINAI, and the fact that Fishman can continue to assist SINAI while incarcerated, even if to a different and lesser degree.

## IV. The Factors Enumerated in Title 18, United States Code, Section 3553(a), On Balance, Support A Guidelines Sentence

The Government also submits that the factors listed in Section 3353(a) of Title 18, United States Code, counsel a sentence within the applicable Guidelines range in this case, as recommended by the Probation Office. In this section, we address only the most salient Section 3553(a) factors.

The nature and circumstances of the offense and the history and characteristics of the defendant support a Guidelines sentence. Unlike many defendants who turn to crime because of poverty and lack of family support or guidance, there is no similar excuse for Fishman's offense. He had a stable middle class childhood and his adult life has been one of privilege. He had a supportive family, received a legal education at one of the nation's best law schools, and achieved partnership in a prestigious law firm. If he suffered from bipolar disorder, it did not prevent him from performing high-level legal work as an international mergers and acquisitions lawyer. Moreover, his fraudulent scheme did not occur during a brief period of poor judgment; instead, it lasted—and escalated—over the course of a decade, with most of the losses occurring during the final three years of his criminal conduct. His offense conduct appears to have stopped only because of Latham's internal investigation.

On the other side of the scale is the defendant's work with SINAI. The Court has substantial discretion to decide how much weight, if any, to accord those activities. However, because Fishman's volunteer work with SINAI prior to his investigation was not extraordinary compared to board members generally, his volunteer work since the start of his investigation was short-lived (six months), and his work from January 2007 onward has been well-compensated (up to $240,000 a year), the Government submits that on balance, the defendant's charitable contributions are not sufficient to outweigh the factors supporting a Guidelines sentence. If the Court were to consider a variance from the Guidelines on this basis, the Government submits that it should not be a significant variance. This is a defendant who was once a leader of the legal community and whose crime violated his fiduciary duties to his firm and his clients, as well as his obligations as an officer of the Court. The history and characteristics of the defendant counsel a sentence that is, at a minimum, close to the Guidelines sentence.

The need for the sentence to reflect seriousness of the offense, promote respect for the law, and provide just punishment for the offense also weighs in favor of a Guidelines sentence. The defendant committed a serious offense; he defrauded his clients and his own firm of an aggregate of approximately $350,000. Fishman did not make a one-time error in judgment. He meticulously altered hundreds of invoices sent to multiple clients and expense reports submitted

to Latham. Although Latham, as the victim (because it reimbursed its clients after discovery Fishman's fraud), does not seek a term of imprisonment for one of its former partners, the goals of sentencing are obviously broader than retribution for the particular victim's loss. The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense counsel a Guidelines sentence.

The likelihood of recidivism is, in the Government's view, a neutral factor. On the one hand, the defendant has no prior criminal history. On the other hand, as discussed above, the offense conduct lasted a decade and did not end until Latham confronted him with the results of its internal investigation.

The need to afford adequate deterrence to criminal conduct supports a Guidelines sentence. The defendant and many of his supporters have argued that the loss of income, retirement security, social status, and general embarrassment are sufficient to serve as general deterrence, such that a term of imprisonment is unnecessary. If that were sufficient to meet the sentencing goal of general deterrence and promotion of respect for the law, most white collar criminals, and especially high-ranking executives, would never receive a prison sentence.

In analyzing the deterrence rationale for sentencing, the First Circuit has explained:

> "One of the goals of the entire guidelines regime was to minimize discrepancies in the treatment of 'white collar' and 'blue collar' offenses." *Thurston*, 358 F.3d [51,] 80 (1st Cir. 2004). From the outset of the guideline regime, the Sentencing Commission determined that the penalties for white collar crime had to be increased because of the inequity in the pre-guideline sentencing practice of "punishing economic crimes less severely than other apparently equivalent behavior." U.S.S.G., ch. 1, pt. A, § 3. . . . [T]he Commission increased the penalties and enhancements for certain white collar offenses. . . . *see also* U.S.S.G. § 2B1.1 (2001) (setting forth the 2001 economic crime sentencing reforms which increased the guideline penalties and enhancements for white collar offenses).

*Thurston*, 456 F.3d at 218. The argument that loss of income and social status is sufficient punishment for fraud runs directly contrary to the Sentencing Commission's determination that economic crimes—which surely are the type of crime most frequently committed by persons of wealth and social privilege—should not be treated more leniently than so-called blue-collar crimes.

Honorable Victor Marrero  Page 8
June 22, 2009

   Consistent with the revisions to the Guidelines to minimize discrepancies between the treatment of white-collar versus blue-collar crimes, the Sentencing Commission has advised that socio-economic status is "not relevant in the determination of a sentence." U.S.S.G. § 5H1.10; *see also United States* v. *Tocco*, 200 F.3d 401, 433-34 (6th Cir. 2000) (explaining that Section 5H1.10 "is an expression of the ancient concept of justice that a man of wealth, position, power, and prestige should not be given special consideration in the law"). *A fortiori*, the Court should not consider the loss of socio-economic status in sentencing Fishman. In sum, the need to afford adequate deterrence to criminal conduct weighs in favor of a Guidelines sentence.

   Finally, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct calls for a Guidelines sentence.

   Although the Guidelines are no longer mandatory, the Second Circuit has instructed district judges to consider them "faithfully" when sentencing. *United States* v. *Crosby*, 397 F.3d 103, 114 (2d Cir. 2005). The Guidelines range for a particular defendant is "a benchmark or a point of reference" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005); *see also Kimbrough* v. *United States*, 128 S. Ct. 558, 574 (2007) ("As explained in [*Rita* v. *United States*, 127 S. Ct. 2456 (2007),] and *[United States* v.*] Gall*, [128 S.Ct. 586, 596 (2007)], district courts must treat the Guidelines as the 'starting point and the initial benchmark.'"). That is because the Guidelines resulted from an empirical study of 10,000 presentence investigations undertaken with the goal of establishing sentencing ranges that would be fair and appropriate for the heartland of cases. U.S.S.G., ch. 1, Pt. A, intro. comment. 3. Accordingly, the Court should not vary from the Guidelines range lightly.

### Conclusion

   For the reasons discussed above, the Government respectfully request that the Court impose a sentence within the applicable Guidelines range of 27 to 33 months' imprisonment.

[Handwritten order box: "The Clerk of Court is directed to place the government's sentencing submission above on the public docket of this case. SO ORDERED: 6-29-09 /s/ Victor Marrero, U.S.D.J."]

By:

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney

Sarah Y. Lai
Assistant United States Attorney
(212) 637-1944

cc: Mr. Jack Litman, Esq. (by facsimile)
   Mr. Richard Asche, Esq. (by facsimile)